**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| WAYNE CATALANO, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. |
| v. | |
| MIDEA AMERICA CORP. | **CLASS ACTION COMPLAINT** |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff, WAYNE CATALANO (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, by his attorneys, alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

## NATURE OF THE ACTION

1. This is a consumer class action arising out of Defendant Midea America Corp.'s manufacture and sale of approximately 1.7 million defective U-shaped and U-shaped inverter window air conditioners which were recalled on June 5, 2025 due to the risk of mold exposure.[1]

2. These air conditioners were advertised, sold, and installed across the United States—including in New York—without adequate warnings or safeguards to prevent mold buildup.

3. The defect at issue causes moisture accumulation that fosters microbial growth, particularly mold, which is then dispersed into the home when the unit operates. Midea's recall

---

[1] https://www.cpsc.gov/Recalls/2025/Midea-Recalls-About-1-7-Million-U-and-U-Window-Air-Conditioners-Due-to-Risk-of-Mold-Exposure (last accessed June 9, 2025).

1

acknowledges this issue but fails to provide any mechanism to identify or remediate mold contamination already seeded by the defective units.

4. Mold exposure is associated with respiratory conditions, allergic reactions, and long-term pulmonary risks. According to the CDC, inhalation of mold spores can cause coughing, wheezing, asthma exacerbation, and hypersensitivity pneumonitis in susceptible individuals.[2]

5. Studies also confirm that HVAC systems are common sources of indoor mold proliferation. Poorly designed or malfunctioning systems that fail to drain condensate can promote extensive mold colonization in ducts, walls, and household contents.[3]

6. Identifying mold in a home is difficult and costly. It typically requires professional environmental testing, which includes air sampling and invasive inspection methods. Remediation costs can exceed $10,000 depending on contamination scope.

7. The recall offered by Midea is limited to inspection and repair or replacement of the air conditioning unit.

8. According to the recall notice[4],

   a. Consumers with the recalled air conditioners should immediately contact Midea for a free repair or a full or prorated refund, which will be based on the purchase date or date of manufacture.

   b. Consumers who want a refund will be requested to send the unit back to Midea using a free shipping label or submit a photograph showing that they cut the unplugged power cord of the unit to receive a refund.

---

[2] Centers for Disease Control and Prevention. "Facts about Mold and Dampness." https://www.cdc.gov/mold/dampness_facts.htm (last accessed June 9, 2025).
[3] Kumari, R. et al. "Mold proliferation in indoor HVAC systems: implications for building health." *Indoor and Built Environment*, 2021.

[4] https://www.cpsc.gov/Recalls/2025/Midea-Recalls-About-1-7-Million-U-and-U-Window-Air-Conditioners-Due-to-Risk-of-Mold-Exposure

      c. Consumers who want a repair should contact Midea to arrange for a technician to install a new drain plug or send consumers a repair kit that includes a new drain plug and bubble level, depending on the model. Consumers who continue using the air conditioners while awaiting a repair should visit www.MideaUrecall.expertinquiry.com for instructions on how to inspect their unit prior to continuing use.

9. The provision of a potential "prorated refund" is wholly inadequate as a product which fosters the development of mold has no value.

10. In addition, the recall is inadequate because no provisions exist to fund or facilitate mold testing or the significant costs of cleaning or replacing contaminated materials.

11. Defendant's failure to disclose this defect at the time of sale—and its refusal to assume responsibility for resulting contamination—constitutes consumer deception and unjust enrichment. Plaintiff and Class Members would not have purchased the units or would have paid significantly less had they known of the contamination risk and limited recourse available.

12. This action seeks damages and equitable relief, including establishment of a court-supervised program to provide mold inspection and remediation funding for all affected class members.

13. Defendant's conduct constitutes unfair and deceptive business practices in violation of New York General Business Law §§ 349 and 350 and resulted in unjust enrichment to Defendant.

# FACTUAL BACKGROUND

14. On June 5, 2025, the U.S. Consumer Product Safety Commission ("CPSC") announced a recall of approximately 1.7 million Midea window air conditioners due to a "risk of mold exposure." [Recall No. 25-320].[5]

15. The recall includes the following Midea air conditioners (hereinafter, "the Products") sold under the Midea brand name and the other brand names and product numbers listed below:.

| **Midea Model Numbers** | **Frigidaire Model Numbers** |
|---|---|
| MAW08AV1QWT | GHWQ085WD1 |
| MAW08AV1QWT-C | GHWQ105WD1 |
| MAW08U1QWT | GHWQ125WD1 |
| MAW08V1QWT | **Insignia Model Numbers** |
| MAW08V1QWT-S | NS-AC8WU3 |
| MAW08V1QWT-T | NS-AC8WU3-C |
| MAW08W1QWT | **Keystone Model Numbers** |
| MAW10U1QWT | KSTAW08UA |
| MAW10V1QWT | KSTAW10UA |
| MAW10W1QWT | KSTAW12UA |
| MAW12AV1QWT | **LBG Products Model Number** |
| MAW12AV1QWT-C | QB-8K CO |
| MAW12U1QWT | **Mr. Cool Model Numbers** |

---

[5] https://www.cpsc.gov/Recalls/2025/Midea-Recalls-About-1-7-Million-U-and-U-Window-Air-Conditioners-Due-to-Risk-of-Mold-Exposure

| | |
|---|---|
| MAW12V1QWT | MWUC08T115 |
| MAW12V1QWT-M | MWUC10T115 |
| MAW12V1QWT-S | MWUC12T115 |
| MAW12W1QWT | **Perfect Aire Model Numbers** |
| **Comfort Aire Model Numbers** | 1PACU10000 |
| RXTS-101A | 1PACU12000 |
| RXTS-121A | 1PACU8000 |
| RXTS-81A | **Sea Breeze Model Numbers** |
| **Danby Model Numbers** | MWAUQB-12CRFN8-BCN10 |
| DAC080B6IWDB-6 | WAU310YREX |
| DAC080B7IWDB-6 | WAU312YREX |
| DAC100B6IWDB-6 | WAU38YREX |

16. The recall states that mold can develop on the evaporator coils of affected units under certain operating conditions, particularly when filters are not cleaned regularly.

17. The CPSC disclosed that the company received "152 reports of mold in the air conditioners, including 17 reports of consumers experiencing symptoms such as respiratory infections, allergic reactions, coughing, sneezing and/or sore throats from mold exposure".[6].

18. The effected models include Products which were sold at Costco, Menards, Home Depot, Best Buy and other stores nationwide and online at Midea.com, Amazon.com, Costco.com,

---

[6] https://www.cpsc.gov/Recalls/2025/Midea-Recalls-About-1-7-Million-U-and-U-Window-Air-Conditioners-Due-to-Risk-of-Mold-Exposure

Menards.com, HomeDepot.com, Lowes.com, Walmart.com, BJs.com, BestBuy.com and other websites from March 2020 through May 2025 for between $280 and $500.[7].

19. Despite this disclosure, Midea's remedy is limited to repairing or replacing the defective air conditioning unit. No assistance is offered for costs associated with identifying or remediating mold contamination within the consumer's home. Additionally, there is no evidence that the offered remedy will actually solve the defect.

20. Mold is often invisible and proliferates behind walls, under carpeting, inside HVAC systems, and on other porous surfaces. Identifying contamination requires specialized environmental assessment, often including air sampling, humidity readings, and surface testing conducted by certified professionals.

21. According to the Environmental Protection Agency ("EPA"), professional mold testing can cost between $200 and $1,000 depending on square footage and sampling complexity.[8]

22. Once mold is identified, remediation often includes containment using negative air pressure barriers, HEPA-filtered air scrubbers, demolition of contaminated materials (e.g., drywall, insulation, carpeting), and application of antimicrobial treatments.

23. Industry cost estimates for professional mold remediation range from $1,500 to $10,000 or more, depending on the severity and spread of the mold.[9] In severe cases involving HVAC contamination or widespread growth behind structural elements, costs can exceed $30,000.[10]

---

[7] https://www.cpsc.gov/Recalls/2025/Midea-Recalls-About-1-7-Million-U-and-U-Window-Air-Conditioners-Due-to-Risk-of-Mold-Exposure
[8] U.S. Environmental Protection Agency, "A Brief Guide to Mold, Moisture and Your Home," https://www.epa.gov/sites/default/files/2016-10/documents/moldguide12.pdf (last accessed June 9, 2025).
[9] Fixr.com, "How Much Does Mold Remediation Cost?" https://www.fixr.com/costs/mold-remediation (estimating national average remediation cost at $2,500–$6,000, depending on location and scope of contamination).
[10] HomeAdvisor, "Mold Removal Cost," https://www.homeadvisor.com/cost/environmental-safety/remove-mold/ (reporting mold remediation costs ranging up to $30,000+ for widespread infestation in HVAC or structural systems).

24. Defendant's recall provides no reimbursement or financial support for these critical services, despite the real risk that its defective units seeded mold in Class Members' homes.

25. Defendant is a large and sophisticated corporation that has been in the business of producing, manufacturing, selling, and distributing consumer products for many years, including producing and manufacturing the recalled Products.

26. Defendant is in the unique and superior position of knowing the means by which its Products are manufactured and the steps needed to produce safe Products.

27. Accordingly, Defendant possesses superior knowledge regarding the risks involved in the production and manufacturing of its Products.

28. Indeed, Defendant designed, manufactured, and tested the Products and was aware that they contained a defect, which allowed water to pool within the Products due to a faulty drain value.  Not only was Defendant aware of the defect through its design, manufacturing, and testing, they received consumer complaints and warranty requests regarding the nature of the defect. Defendant was aware of at least 152 reports of mold in the air conditioners, including 17 reports of consumers experiencing symptoms such as respiratory infections, allergic reactions, coughing, sneezing and/or sore throats from mold exposure.  However, none of this information was publicly available.  Instead, such design, testing, manufacturing, warranty, and consumer complaints are within the exclusive possession and knowledge of Defendant.

29. The fact that the Products cause moisture accumulation that fosters microbial growth, particularly mold growth, is not information that is reasonably accessible to Plaintiff and the class members.  The only possible way for Plaintiff and the Class Members to obtain such information would be to conduct their own independent testing on the Products prior to purchasing

the Products. No reasonable consumer commissions laboratory testing before purchasing an air conditioner.

30. Defendant has a duty to provide consumers, like Plaintiff and Class Members, with accurate information about its Products.

31. Therefore, Defendant's deceptive omissions regarding the Products propensity to foster mold growth is likely to continue to deceive and mislead reasonable consumers and the public, as they have already deceived and misled Plaintiff and the Class Members.

32. By omitting that the Products cause mold growth on the labels of the Products throughout the Class Period, Defendant knew that those omissions are material to consumers since they would not purchase Products which cause mold growth.

33. Defendant's deceptive omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

34. Plaintiff and the Class Members reasonably relied to their detriment on Defendant's misleading omissions.

35. Defendant's false, misleading, and deceptive omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff and the Class Members.

36. In making the false, misleading, and deceptive omissions described herein, Defendant knew and intended that consumers would pay a premium for Products marketed without the likelihood of causing mold growth over comparable products not so marketed.

37. As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representation and omission, Defendant injured Plaintiff and the Class Members in that they:

   a. Paid a sum of money for Products that were not what Defendant represented;

   b. Paid a premium price for Products that were not what Defendant represented;

   c. Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted; and

   d. Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented,

53. Had Defendant not made the false, misleading, and deceptive omissions, Plaintiff and the Class Members would not have been willing to pay the same amount for the Products they purchased and, consequently, Plaintiff and the Class Members would not have been willing to purchase the Products.

## JURISDICTION AND VENUE

38. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. section §1332(d) in that (1) this is a class action involving more than 100 class members; (2) Plaintiff is a citizen of New York and Defendant is a citizen of New Jersey; and (3) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

39. This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the state of New York, contracts to supply goods within the state of New York, and supplies goods within the state of New York.

40.     Venue is proper because Plaintiff and many Class Members reside in the Southern District of New York, and throughout the state of New York.  A substantial part of the events or omissions giving rise to the Classes' claims occurred in this district.

## PARTIES

**Plaintiff**

41.     Plaintiff Wayne Catalano is a citizen and resident of Dutchess County, New York. Plaintiff purchased the Products a brick and mortar retail store in 2024 in Dutchess County.

42.     Plaintiff used the product in his home during the summer of 2024.  At no time was Plaintiff warned that the unit could harbor and spread mold spores into the home environment.

43.     Defendant Midea America Corp. is a New Jersey corporation headquartered in Parsippany, New Jersey. It is a wholly owned subsidiary of Midea Group, a multinational appliance manufacturer headquartered in China.

44.     Defendant manufactures, distributes, and sells consumer products under various brand names.

## CLASS ALLEGATIONS

45.     Plaintiff brings this matter on behalf of himself and those similarly situated.  As detailed at length in this Complaint, Defendant orchestrated deceptive marketing and labeling practices.  Defendant's customers were uniformly impacted by and exposed to this misconduct.  Accordingly, this Complaint is uniquely situated for class-wide resolution.

46.     The Class is defined as all consumers who purchased the Products anywhere in the United States during the Class Period.

47. Plaintiff also seeks certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of New York at any time during the Class Period (the "New York Subclass").

48. The Class and New York Subclass are referred to collectively throughout the Complaint as the Class.

49. The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

50. <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of consumers in the Class and the New York Class who are Class Members as described above who have been damaged by Defendant's deceptive and misleading practices.

51. <u>Commonality</u>: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

    a. Whether Defendant was responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

    b. Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of its Products;

    c. Whether Defendant made false and/or misleading statements and omissions to the Class and the public concerning the contents of its Products;

11

d. Whether Defendant's false and misleading statements and omissions concerning its Products were likely to deceive the public; and

e. Whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members.

52. <u>Typicality</u>: Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased Defendant's Products. Plaintiff is entitled to relief under the same causes of action as the other Class Members.

53. <u>Adequacy</u>: Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the Class Members he seeks to represent, his consumer fraud claims are common to all members of the Class, he has a strong interest in vindicating his rights, he has retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

54. <u>Predominance</u>: Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class. The Class issues fully predominate over any individual issues because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading marketing and labeling practices.

55. <u>Superiority</u>: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a. The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b. The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

c. When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d. This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude their maintenance as a class action;

f. This class action will assure uniformity of decisions among Class Members;

g. The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h. Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by a single class action; and

i. It would be desirable to concentrate in this single venue the litigation of all Class Members who were induced by Defendant's uniform false advertising to purchase its Products.

56. Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members

predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS

### FIRST CAUSE OF ACTION
### VIOLATION OF NEW YORK GBL § 349
**(On Behalf of Plaintiff and New York Subclass Members)**

57. Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

58. New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

59. The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and the New York Subclass Members seek monetary damages against Defendant.

60. There is no adequate remedy at law.

61. Defendant misleadingly, inaccurately, and deceptively advertises and markets its Products to consumers.

62. Defendant's improper consumer-oriented conduct— selling its Products without disclosing the potential health risks associated with the Products due to their propensity for fostering mold growth—is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass Members to purchase Defendant's Products and to use the Products when they otherwise would not have. Defendant made the untrue and/or misleading statements and omissions willfully, wantonly, and with reckless disregard for the truth.

63. Plaintiff and the New York Subclass Members have been injured inasmuch as they purchased Products that were mislabeled. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and paid for.

64. Defendant's advertising and Products' packaging and labeling induced Plaintiff and the New York Subclass Members to buy Defendant's Products.

65. Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Subclass Members have been damaged thereby.

66. As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and the New York Subclass Members are entitled to monetary, statutory, and compensatory damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## VIOLATION OF NEW YORK GBL § 350
**(On Behalf of Plaintiff and the New York Subclass Members)**

67. Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

68. N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

69. N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination

15

> thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

70. Defendant's labeling and advertisements contain untrue and materially misleading statements and omissions concerning its Products inasmuch as it omits disclosure of the potential health risks associated with the Products due to their propensity for fostering mold growth.

71. Plaintiff and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and purchased Products that were mislabeled, unhealthy, and entirely worthless. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and paid for.

72. Defendant's advertising, packaging, and Products' labeling induced Plaintiff and the New York Subclass Members to buy Defendant's Products.

73. Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

74. Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

75. Defendant made the material omissions described in this Complaint in its advertising and on the Products' packaging and labeling.

76. Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

77. As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory, and compensatory

damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

## THIRD CAUSE OF ACTION
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and All Class Members)

78. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

79. Plaintiff, on behalf of himself and consumers nationwide, brings a claim for unjust enrichment.

80. Defendant's conduct violated, *inter alia*, state law by manufacturing, advertising, marketing, and selling its Products while misrepresenting and omitting material facts.

81. Defendant's unlawful conduct as described in this Complaint allowed Defendant to knowingly realize substantial revenues from selling its Products at the expense of, and to the detriment or impoverishment of, Plaintiff and Class Members and to Defendant's benefit and enrichment. Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

82. Plaintiff and Class Members conferred significant financial benefits and paid substantial compensation to Defendant for the Product, which was not as Defendant represented them to be.

83. Accordingly, it is inequitable for Defendant to retain the benefits conferred by Plaintiff and Class Members' overpayments.

84. Plaintiff and Class Members seek disgorgement of all profits resulting from such overpayments so that Plaintiff and Class Members may seek restitution.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

(a) Declaring this action to be a proper class action and certifying Plaintiff as the representative of the Class under Rule 23 of the FRCP;

(b) Awarding monetary damages, restitution damages and treble damages;

(c) Awarding statutory damages of $50 per transaction, and treble damages for knowing and willful violations, pursuant to N.Y. GBL § 349;

(d) Awarding statutory damages of $500 per transaction pursuant to N.Y. GBL § 350;

(e) Ordering Defendant to establish a court-supervised program to fund mold testing and remediation in affected homes;

(f) Awarding Plaintiff and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, experts, and reimbursement of Plaintiff's expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

Dated: June 9, 2025

**SULTZER & LIPARI, PLLC**

By:    */s/Philip J. Furia*

_____
Philip J. Furia, Esq.
Jason P. Sultzer, Esq.
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
furiap@thesultzerlawgroup.com
sultzerj@thesultzerlawgroup.com

Russell M. Busch
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Tel: (630) 796-0903
rbusch@milberg.com

Nick Suciu III (*pro hac vice* forthcoming)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel: (313)303-3472
nsuciu@milberg.com

Trenton R. Kashima (*pro hac vice* forthcoming)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
402 West Broadway St., Suite 1760
San Diego, CA 92101
Tel: (619) 810-7047
tkashima@milberg.com

**POULIN | WILLEY | ANASTOPOULO, LLC**
Paul J. Doolittle (*Pro Hac Vice* Forthcoming)
paul.doolittle@poulinwilley.com
cmad@poulinwilley.com
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536

*Counsel for Plaintiff and the Class*